ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

STEVEN ANDREW SCHULTZ : Case No.   A 1 5 0 6 8 6 1
25809 East Way Drive :
Guilford, Indiana 47022 :
: Judge:
:
**Plaintiff,** :
: **COMPLAINT & JURY**
v. : **DEMAND**
:
: 
ABUBAKAR ATIQ DURRANI, M.D., :
Pakistan :
(Serve via Hague Convention) : **D112929897 1NI**
:
And : **(ALL NEW DR. DURRANI**
: **CASES SHALL GO TO**
**CENTER FOR ADVANCED SPINE** : **JUDGE RUEHLMAN PER**
**TECHNOLOGIES, INC.** : **HIS ORDER)**
(Serve via Hague Convention) :
:
And :
:
**WEST CHESTER HOSPITAL, LLC** :
7700 UNIVERSITY DRIVE :
WEST CHESTER, OH 45069 :
:
SERVE: GH&R BUSINESS SVCS., INC. :
511 WALNUT STREET :
1900 FIFTH THIRD CENTER : **REGULAR MAIL WAIVER**
CINCINNATI, OH 45202 :
(Serve via Certified mail) :
:
And :
:
**UC HEALTH** :
SERVE: GH&R BUSINESS SVCS., INC. :
511 WALNUT STREET :
1900 FIFTH THIRD CENTER : **REGULAR MAIL WAIVER**
CINCINNATI,OH 45202 :
(Serve via Certified mail) :
:
**Defendants.** :

FILED
2015 DEC 16 P 1: 53
TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

Comes now Plaintiff, Steven Andrew Schultz, and files this Complaint and jury demand, pursuant to the agreement of the parties and Order of the Court, and states as follows:

1.      At all times relevant, Plaintiff was a resident of and domiciled in the State of Indiana.

2.      At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.      At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

5.      At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

6.      At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.      UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8.   UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

9.   UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

10.   The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

11.   The amount in controversy exceeds the jurisdictional threshold of this Court.

12.   This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

## FACTUAL ALLEGATIONS OF PLAINTIFF

13. In April, 2010 Plaintiff first began treatment with Dr. Durrani at CAST in Blue Ash. Dr. Durrani recommended surgery immediately in the first visit.

14. Plaintiff sought a second opinion from a doctor who told him surgery was not necessary.

15. Dr. Durrani encouraged Plaintiff to undergo surgery despite lack of medical evidence and promised him it would give him immediate pain relief and be minimally invasive.

16. On or about September 28, 2011 Dr. Durrani performed a lumbar spinal surgery on Plaintiff at West Chester Hospital installing hardware and fusing L5-S1.

17. During the surgery Dr. Durrani and his surgical staff negligently struck an artery, which required emergency laparotomy surgery and 14 units of blood to be transfused to control the hemorrhage of the venus plexis.

18. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" without Plaintiff's knowledge or consent, causing harm.

19. Following the surgery, Plaintiff's pain increased. Plaintiff followed up at CAST.

20. Plaintiff continued to inform Dr. Durrani that his pain was worse.

21. Dr. Durrani had no rational explanation for Plaintiff's increase in pain so Plaintiff sought treatment with Dr. Bohinski at Mayfield Clinic.

22. Dr. Bohinski performed a revision surgery on Plaintiff extending the rods to L4-S1, removing the aberrant hardware and reinstalling new hardware correctly

23. Upon information and belief, the surgery at West Chester upon Mr. Schultz by Dr. Durrani was medically unnecessary.

24. As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiff has suffered harm.

25. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

26.    This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

27.    Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

28.    Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

29.    Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

30.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

31.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

32.    Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

33.    According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

34.    According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

35.    Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

36.    Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

37.    At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

38.    Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

39.    Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

40.    Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

41.    Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

42.    Dr. Durrani would schedule two to three spine surgeries a day at Children's.

43.    Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

44.    Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

45.    Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

46.    There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

47.    Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

48.    Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

49.    Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

50.    Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

51.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

52.     *Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.*

53.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

54.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

55.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

56.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

57.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

### INFUSE/BMP-2

### I.     BACKGROUND INFORMATION

58.     The Deters Law Firm, P.S.C., represents approximately 500 Plaintiffs in medical malpractice actions against a former Northern Kentucky/Cincinnati-area spine surgeon named Abubakar Atiq Dr. Durrani (Dr. Durrani), his company, Center for Advanced Spine Technologies, Inc. (CAST), and several area hospitals including, but not limited to, West Chester Hospital (WCH), University of Cincinnati Health (UC Health), Cincinnati Children's Hospital

Medical Center (CCHMC), Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and Journey Lite of Cincinnati, LLC (Journey Lite) (collectively Hospitals).

59.     Dr. Durrani performed unnecessary, fraudulent, dangerous, and ultimately damaging surgeries on these Plaintiffs while working for and with these Hospitals.

60.     The scheme and artifice to defraud that Dr. Durrani devised, executed, and attempted to execute while working for and with the Hospitals included the following patterns and practices:

> a.     Dr. Durrani persuaded the patient that surgery was the only option, when in fact the patient did not need surgery.

> b.     Dr. Durrani told the patient that the medical situation was urgent and required immediate surgery. He also falsely told the patient that he/she was at risk of grave injuries without the surgery.

> c.     Dr. Durrani often told his cervical spine patients that they risked paralysis or that his/her head would fall off if he/she was involved in a car accident, ostensibly because there was almost nothing attaching the head to the patient's body.

> d.     Dr. Durrani often ordered imaging studies such as x-rays, CT scans, or MRIs for patients but either did not read or ignored the resulting radiology reports.

> e.     Dr. Durrani often provided his own exaggerated and dire reading of the patient's imaging study that was either inconsistent with or was plainly contradicted by the radiologist's report. At times, Dr. Durrani provided a false reading of the imaging.

> f.     Dr. Durrani often dictated that he had performed certain physical examinations and procedures on patients that he did not actually perform.

> g.     Dr. Durrani often ordered a pain injection for a level of the spine that was inconsistent with the pain stated by the patient or with that indicated by the imaging. Dr. Durrani also scheduled patients for surgeries without learning of or waiting for the results of certain pain injections or related therapies.

      h.      Dr. Durrani often dictated his operative reports or other patient records months after the actual treatment had occurred.

      i.      Dr. Durrani's operative reports and treatment records contained false statements about the patient's diagnosis, the procedure performed, and the instrumentation used in the procedure.

      j.      When a patient experienced complications resulting from the surgery, Dr. Durrani at times failed to inform the patient of, or misrepresented the nature of, the complications.

      k.      All of the above-mentioned actions were done with the knowledge, cooperation, or intentional ignorance of the Hospitals because Dr. Durrani was one of the biggest moneymakers for the Hospitals.

61.     In addition to the civil medical malpractice actions against Dr. Durrani, on August 7, 2013, he was indicted by the Federal Government for performing unnecessary surgeries and for defrauding the Medicare and Medicaid programs. Specifically, the ten-count complaint charged Dr. Durrani with health care fraud, in violation of 18 U.S.C. § 1347, and making false statements in health care matters, in violation of 18 U.S.C. § 1035. There was a subsequent superseding indictment adding over 30 counts.

62.     Following these criminal indictments, in December of 2013 and prior to the first Plaintiff's trial in these actions, Dr. Durrani fled the United States and returned to Pakistan. He has not returned to the United States to face allegations of either criminal or civil liability.

63.     Among Dr. Durrani's and the Hospitals' professional failings was the use of a synthetic bone-morphogenetic protein called BMP-2, which was marketed under the trade name "Infuse." Dr. Durrani used BMP-2/Infuse in ways that were either not approved by the federal Food and Drug Administration (FDA) or that were specifically contraindicated as noted on the FDA-approved product labeling. The Defendants had full knowledge of this fact.

64.     BMP-2/Infuse was, at the time of the surgeries in question, and currently still is manufactured by a company called Medtronic, Inc. (Medtronic).

65.     Dr. Durrani predominantly used BMP-2/Infuse on patients at WCH, which is owned by UC Health.

66.     It is Plaintiffs' position that this non-FDA-approved use of BMP-2/Infuse was not only negligent, and fraudulent, but criminal based upon the manner in which it was allowed to be used by Dr. Durrani at West Chester, all with the knowledge and full support of the Defendants.

## II.     THE PLAYERS REGARDING BMP-2

67.  Dr. Durrani is a citizen of the Republic of Pakistan and was a permanent resident of the United States who, from approximately 2005 to 2013, worked as a spine surgeon in and around Cincinnati, Ohio, until he fled the United States to escape civil liability and criminal prosecution.

68.  Medtronic is an Irish corporation, with its principal executive office located in Dublin, Ireland, and its operational headquarters located in Minneapolis, Minnesota. Medtronic is the world's third largest medical device company and manufactures and markets BMP-2/Infuse. Medtronic sales representatives were also present during the experimental surgeries performed on Plaintiffs, who are clients of the Deters Law Firm.

69.  CAST was a corporation organized under the laws of Ohio and had business and medical offices in Florence, Kentucky and Evendale, Ohio. CAST was owned, in whole or in part, by Dr. Durrani.

70.  Bahler Medical, Inc. is a manufacturer of medical implants and is a corporation located in the state of Ohio.

71. David Rattigan is an Ohio resident and was and is a sales representative for Medtronic. Further, he is affiliated with Bahler Medical, Inc., was involved in many of the transactions involving BMP-2, and was present for the experimental surgeries in which BMP-2 was used.

72. West Chester Hospital, LLC is a corporation organized under the laws of Ohio. It provides medical facilities and billing support to physicians, including Dr. Durrani, in the state of Ohio. WCH is owned by UC Health.

73. UC Health is a private, non-profit corporation organized under the laws of Ohio. It provides medical facilities, management, administrative, ancillary, and billing support to physicians, and it owns WCH.

74. CCHMC is a medical facility in Ohio where Dr. Durrani was an employee until approximately 2008.

### III.    WHAT IS BMP-2/INFUSE?

75.    The full name of BMP-2 is "Recombinant Human Morphogenetic Protein-2" (also called rhBMP-2). The following definitions apply:

        a.    Recombinant – Artificially created in a lab;

        b.    Morphogenetic – Evolutionary development of an organism;

        c.    Protein – Essential for growth and repair of tissue.

76. Recombinant human protein (rhBMP-2) is currently available for orthopedic usage in the United States.

77. Medtronic manufactured, marketed, sold, and distributed BMP-2 under the trade name "Infuse."

78. BMP-2 has been shown to stimulate the production of bone.

79. Implantation of BMP-2 in a collagen sponge induces new bone formation and can be used for the treatment of bony defects, delayed union, and non-union.

## BMP-2 AS A BIOLOGIC

80.     BMP-2 is not a device, but instead it is a biologic. *See* July 2009 American Medical

Association Article and 2011 Stanford School of Medicine Article.

81.     According to the FDA, "[a] 'biological product' means a virus, therapeutic serum, toxin,

antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous

product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic

compound), applicable to the prevention, treatment, or cure of a disease or condition of human

beings (Public Health Service ActSec.351(i)1."Available

http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

82.     BMP-2 is a Bone-Morphogenetic Protein that is used to promote bone creation and

remolding and falls under the definition of a biologic. *See* AMA article ("bone forming

properties") and Stanford Article. BMP-2 differs from a medical device in that once implanted, it

can only be removed days after surgery.  If a patient had a complication due to BMP-2 and did

not discover this complication until year after surgery, the patient could not have BMP-2

removed to reduce the complication because BMP-2 is so integrated into the patient's bone.

83.     A patient has a right to determine what happens to his or her body and the preservation of

that right requires that the patient be informed when a bone growth product, that causes

irreversible harm, is placed in his or her body.

## WHEN IS IT USED?

84.     Recombinant human BMPs are used in orthopedic applications such as spinal fusions,

non-unions, and oral surgery.

85.     The bone graft contains two parts. The first is a solution of human bone growth protein or

morphogenetic protein-2. This protein is found in the human body in small dosages and is

important for the healing and formation of bones. The protein is genetically engineered to be

utilized in the Infuse Bone Graft product, and it is employed for the stimulation of formation and growth in bones.

86.    The second part of the bone graft is an absorbable collagen sponge.

87.    Both components of the Infuse Bone Graft structure are used to fill the LT-Cage Lumbar Tapered Fusion Device. This chamber is intended to restore the deteriorated disc space to its original height.

88.    FDA-approved use for the Infuse Bone Graft product is only for lower back surgery using an anterior lumbar interbody fusion (ALIF), a technique where the operation on the spine is conducted through the abdomen.

89.    In addition, the Infuse Bone Graft product must be used in conjunction with Medtronic's LT-Cage. Use of BMP-2 without the LT-Cage is considered an "off-label" use.

**CONTRAINDICATIONS OF USE**

90.    The FDA specifically warns against the use of Infuse in the cervical spine, citing reports of "life-threatening complications."

91.    Any use of Infuse other than in lumbar spine surgeries with the LT-Cage is considered "off-label" use

92.    Infuse should never be used on the skeletally immature patient, i.e., in patients less than 18 years of age or those with no radiographic evidence of epiphyseal closure.

93.    Infuse should never be used in the vicinity of a resected or extant tumor.

94.    Infuse should never be used in those patients known to have active infection at the surgical site.

**RISKS ASSOCIATED WITH OFF-LABEL USE**

95.    When used in an off-label manner, patients may experience problems with pregnancy,

including but not limited to: complications in fetal development; allergic reactions to titanium,

bovine type I collagen, or bone morphogenetic protein–2; infection; the creation or

intensification of tumors; liver or kidney disease; lupus or human immunodeficiency virus

(HIV/AIDS); problems with radiation, chemotherapy, or steroids if a patient is malignant;

paralysis; bowel and/or bladder dysfunctions; sexual disorders, including sterilization and

incompetence; respiratory failure; excessive bleeding, and; death.

**IV.    THE REGULATORY PROCESS**

96.    The Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act,

21 U.S.C. § 301 et seq., established two separate approval processes for medical devices: Pre–

Market Approval (PMA) and Pre–Market Notification.[1]

97.    The FDA's PMA process is lengthy and involves extensive investigation by the FDA.

The PMA application requires manufacturers to submit extensive animal and human data to

establish their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental

program under close FDA scrutiny must be successfully completed before FDA approval can be

obtained under this process. FDA regulations also require PMA applicants to submit copies of

all proposed labeling for the device. 21 C.F.R. § 814.20(b)(10). The FDA approves a PMA

---

[1] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.[2]

98.     In contrast, the FDA's Pre–Market Notification process is more abbreviated and involves less FDA oversight. This process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. Pre–Market Notification applicants must also submit their proposed labeling. 21 C.F.R. § 807.87. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDA in 1976, the applicant is free to market the device.

99.     BMP-2 received PMA (PMA number P000058) for the Infuse/BMP-2 Lumbar Tapered Fusion Device, which PMA provided for limited use with specific requirements for its use on individuals. See Medtronic Package Insert.

## SCOPE OF THE PMA AND PRODUCT LABELING

100.    The PMA for BMP-2 provided that the product may only be used in patients with the following characteristics:

          d.      Skeletally mature patient, AND

          e.      At levels L2-S1, AND

          f.      Confirmed degenerative disc disease (DDD), AND

          g.      Using only an open anterior or anterior laparoscopic approach, AND[3]

          h.      Six months of non-operative treatment prior to treatment with the device, AND

          i.      In combination with the metallic LT-CAGE.[4]

---

[2] *Fender v. Medtronic,* 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

[3] The anterior interbody fusion approach was developed because the risk of non-union (pseudarthrosis) is significantly higher in posterior approaches. The biggest risk factor for fusion surgery is non-union.

[4] Instrumented fusions involve hardware and are more stable fusions with a shorter recovery time than non-instrumented fusions.

See Medtronic Package Insert, "INDICATIONS."

101.    According to Medtronic's package insert for BMP-2/Infuse as well as other industry

literature, the following risks are associated with the use of BMP-2/Infuse:

A.    Male Sterility

B.    Cancer

C.    Increased progression of cancer

D.    Suffocation of the cervical region

E.    Bone fracture

F.    Bowel/bladder problems

G.    Loss of spinal mobility or function

H.    Change in mental status

I.    Damage to blood vessels and cardiovascular system compromise

J.    Excessive bone mass blocking the ability to treat pain

K.    Damage to internal organs and connective tissue

L.    Death

M.    Respiratory problems

N.    Disassembly and migration of components

O.    Dural tears

P.    Ectopic and exuberant bone formation

Q.    Fetal development complications (birth defects)

R.    Foreign body (allergic) reaction

S.    Gastrointestinal complications

T.    Incisional complications

U.    Infection

V.      Insufflation complications

W.      Neurological system compromise

X.      Non-union

Y.      Delayed union

Z.      Mal-union

AA.     Change in curvature of spine

BB.     Retrograde ejaculation

CC.     Scars

DD.     Tissue and nerve damage

EE.     Itching

FF.     Pain

GG.     Hematoma

HH.     Anaphylactic reaction

II.     Elevated erythrocyte sedimentation rate

102.    Injury Percentages:

j.      Ectopic Bone Growth-63%

k.      Inflammatory Neuritis-15%

l.      Osteolysis/Subsidence-13%

m.      Acute Swelling-7%

n.      Retrograde Ejaculation-2%

o.      85% of time, BMP-2 implanted in off-label use

103.    Not a single one of these risks in the last two paragraphs were ever explained to a single

patient at Children's Hospital by Dr. Durrani.

104.    BMP-2 was NOT approved by the FDA for use in the cervical and thoracic spine and BMP-2 was NOT safe or approved for use in children less than 21 years of age. These uses are considered "off-label."

## "OFF-LABEL" USE

105.    A use of a device is considered "off-label" if it is not approved under the Pre-Market Approval process OR cleared for such use pursuant to 21 U.S.C. § 360c(f) (also known as "the 510k premarket notification process").

106.    Infuse can be implanted in an off-label manner in three ways:

p.      Approach/position: Any approach other than an anterior approach;

q.      Product: Failure to use LT-Cage (or any cage); mixing rhBMP-2 with other grafting products like Allograft or Autograft;

r.      Discs: Use on multiple levels or on a level outside of L2-S1.

107.    Dr. Durrani and the Hospitals in which he performed surgeries repeatedly used BMP-2 in these non-FDA-approved manners.

## THE NON-COMPLIANCE WITH THE REGULATORY PROCESS

108.    The PMA 000058 "Conditions of Approval" specifies the following condition: "Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by the FDA ... [a] PMA supplement or alternate submission shall comply with applicable requirements under 21 C.F.R. 814.39[.]"

109.    21 C.F.R. 814.39 requires a PMA supplement pursuant to subsection (a)(1) for new indications of use of the device and pursuant to subsection (a)(6) for changes in components.

110.    The PMA 000058 "Conditions of Approval" notes the post-marketing reporting requirement imposed by 21 C.F.R. 814.84, particularly "Identification of changes described in 21

C.F.R. 814.39(a)." Medtronic did not comply with this requirement relating to the intended uses and componentry.

111.    The FDA can impose post-approval requirements in the PMA pursuant to 21 C.F.R. 814.82, and this fact results in the device being characterized as "restricted" pursuant to 21 U.S.C. § 360j(e) for purposes of 21 U.S.C. § 352(q). Section 352(q) states that any restricted device that is distributed or offered for sale with false or misleading advertising is "misbranded."

112.    "Indications for use" is a necessary part of the PMA application and the "Indications for use" are required to be limited by the application. Any different use is inconsistent with the PMA.

113.    A device that fails to meet the requirements of the PMA or 21 C.F.R. 814 is "adulterated" as defined by 21 U.S.C. § 351(f).

114.    21 C.F.R. 801.6 defines a misleading statement related to a DIFFERENT device contained in the label delivered with the device intended to be used will render the device to be used misbranded.

115.    Medtronic did not apply for a PMA supplement, as required by the FDA generally and PMA 000058 specifically, for the off-label uses, nor did it provide warnings of the risks known about the off-label uses. All named Defendants in these cases knew about the occurrences of off-label use.

116.    The PMA requires an application prior to marketing for new indicated uses by incorporating the federal requirements and explicitly reciting the text of 21 C.F.R. 814.39 and 814.84 and by specifically stating the range of indicated uses on the PMA.

## V.   **MEDTRONIC**

117.   In or about 2001, Medtronic began preparing for the launch of two spinal fusion products, PYRAMID and INFUSE (BMP-2), which it projected would enjoy broad application with spinal surgeons and their patients on a nationwide basis.

118.   Medtronic anticipated that both products would initially be limited in application.

119.   Motivated by greed and a desire to gain competitive advantage in the marketplace, Medtronic began a course of conduct designed to broaden the application of both products by end-users. The course of conduct involved fraud, false statements, material misrepresentation, and deceit for the purpose of broadening the sales of these products beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

120.   On or after July 2, 2002, Medtronic received notification that its Pre-Market Approval application for its BMP-2/Infuse bone graft products had been approved by the FDA. However, such approval was limited to the application of the device from the L4 through S1 levels. Further, the approval mandated the conduct of post-approval studies to evaluate the long-term performance of the BMP-2 bone graft and to study the potential side effects and complications such as the promotion of tumors by the bone morphogenetic protein component of BMP-2. Other studies were conducted as well. See "Allegations against Medtronic in the Unsealed Mississippi False Claims Case."

121.   Medtronic engaged in a fraudulent course of conduct designed to maximize its revenues from BMP-2, regardless of whether it would eventually be allowed to remain on the market.

122.   One of the physicians Medtronic co-opted into its fraudulent scheme was a Thomas A. Zdeblick, M.D. Dr. Zdeblick was an orthopedic surgeon whose invention, the LT-Cage, was the only approved device to act as the delivery vehicle for BMP-2 into the body.

123.    Dr. Zdeblick enjoyed a position within the scientific community as a Key Opinion Leader, and he was both a practicing orthopedic surgeon and professor at the University of Wisconsin.

124.    In one of Dr. Zdeblick's first attempts to tout his LT-Cage and rhBMP-2, which would become the active ingredient in the ultimate Infuse/BMP-2 product, he encountered some drawbacks to his goal of promoting his and Medtronic's products, which arose from the policy of certain industry journals, including the journal *Spine*, which followed industry standards before printing peer-reviewed material. See article in the journal *Spine*, published in 2000.

125.    Not only were the drawbacks related to industry publishing standards, but the National Consumer Health Information and Health Promotion Act of 1976 enacted certain provisions at 42 U.S.C. § 300u, et seq., whereby the Federal Government had entered the field of medical research publication. Such standards promulgated by the Secretary of the predecessor to the U.S. Department of Health and Human Services required that applications for grants and contracts must be subject to "appropriate peer review." See 42 U.S.C. § 300u-1.

126.    The drawbacks encountered with the peer-reviewed *Spine* article were as follows:

a.      Attribution that the study was "sponsored by Medtronic Sofamor Danek, Inc.;"

b.      The study was conducted under FDA regulations, and was "...designed as a prospective, multicenter, nonblinded, randomized, and controlled pilot study;" and

c.      It was accompanied by a cautionary comment, or Point of View, which minimized the exuberance and import of the article.

127.    In the article, BMP-2 was touted by Zdeblick and the co-authors as the potential realization of a dream of Dr. Marshall Urist, a revered pioneer in the industry and discoverer of BMP, where it closed with the following: "...it is encouraging to note that Marshall Urist's seminal observation made more than 34 years ago may finally come to clinical fruition."

128. In the Point of View, a Dr. John O'Brien of London questioned whether there could be long-term problems associated with the product. He treated Zdeblick's study with caution and pointed out that simple plaster of Paris has achieved the same or similar results more than 50 years prior. He posited that, "[p]erhaps vascularization…fixation procedures are as important as the biochemical composition of the 'filler.'"

129. Vascularization is achieved through removal of the disc material between two vertebral bodies and then the scraping of the surfaces of the vertebral bodies in a fusion procedure; fixation is the process of securing the motion segment through medical hardware. In other, if the alternative proposed by Dr. O'Brien proved to achieve equivalent or better results, Zdeblick and Medtronic's Infuse/BMP-2 products would be useless and unnecessary.

130. Certain efforts would follow in an attempt to alleviate the drawbacks encountered with the 2000 *Spine* journal article.

131. In 2002, Dr. Zdeblick was installed as the sole editor-in-chief of a medical journal known prior to his installation as the *Journal of Spinal Disorders*. Prior to his installation, the journal enjoyed a fourteen year history under the co-editorship of Dr. Dan Spangler and Dr. Tom Ducker. Once installed, Dr. Zdeblick successfully supplanted Drs. Dan Spengler and Tom Ducker and became the sole editor-in-chief, a position which would enable him to have greater control and would aid his participation in the fraudulent scheme.

132. During this same time period, Dr. Zdeblick also enjoyed a position on the associate editorial board of the medical journal *Spine*, the leading publication covering all disciplines relating to the spine.

133.    In one of Dr. Zdeblick's actions as editor-in-chief, he set about re-purposing the journal in a way that would aid him in the furtherance of the fraudulent scheme through the streamlining of the publication process.

134.    In furtherance of the fraudulent scheme, Dr. Zdeblick re-purposed the journal and renamed it the *Journal of Spinal Disorders and Techniques* (JSDT), announcing that the new journal was "entering a new partnership with *Spine*." As part of this partnership, *Spine* would "continue to function as a broad-based scientific journal" tailored to both clinicians and scientists. However, the *Journal of Spinal Disorders and Techniques* would be directed solely to physicians in clinical practice.

135.    Dr. Zdeblick's stated goal was "to provide a forum for up-to-date techniques...", and in furtherance of that goal, Dr. Zdeblick announced that his journal would publish Class II or better clinical articles but would "occasionally accept cutting edge articles with less than one year follow-up." To justify this streamlined process, Dr. Zdeblick claimed as his goal the ability of his journal "to keep up with the fast pace of progress in the treatment of spinal patients."

136.    Arm-in-arm with Medtronic and others, Dr. Zdeblick would in short order abuse his position of trust as the editor-in-chief of JSDT.

137.    In the October 2002 edition, JSDT published an article entitled, "Anterior Lumbar Interbody Fusion using rhBMP-2 with Tapered Interbody Cages." This article was co-authored by, among others, Curtis A. Dickman, M.D., who was a developer of Medtronic's PYRAMID plate and who has been paid significant sums by Medtronic through royalty agreements, consulting agreements, and education training and speaking agreements.

138.    In addition to his interest in the PYRAMID plate, Dr. Dickman had assisted Medtronic in the approval process for Infuse/BMP-2. As part of the pre-approval hearing process, Dr.

Dickman and his Barrow Neurological Associates Group of Phoenix, Arizona had submitted a letter to the meeting of the FDA's Orthopedics and Rehabilitation Devices Advisory Panel, which met on January 10, 2002. In that letter, Dr. Dickman represented that "approval of BMP would provide a significant advance for patient outcome and satisfaction following spinal fusion."

139.    In the October 2002 issue of JSDT touting the benefits of Infuse/BMP-2, Zdeblick and others failed to disclose their financial ties to Medtronic, though industry standards require such acknowledgement. Not only did Dr. Zdeblick fail to disclose that he profited from each and every surgery which Infuse/BMP-2 was used through rights in the exclusive delivery vehicle, his LT-Cage, but no reference whatsoever to their financial ties to Medtronic was made either by Dr. Zdeblick or Dr. Dickman.

140.    For years, the recognized gold standard for spinal bone grafts has been the use of autogenous bone, or bone harvested from the patient's own iliac crest, or hip bone. Medtronic designed to have its Infuse/BMP-2 product supplant autogenous bone as the gold standard in the medical community, and utilized false statements, a fraudulent enterprise and the support of Federal funds to do so.

141.    As part and parcel of Medtronic's fraudulent scheme, the October 2002 study was published in Dr. Zdeblick's journal three months after Medtronic received FDA approval for Infuse. As the article shows, it was actually received on March 28, 2002 or after Dr. Zdeblick had accomplished installment as the editor-in-chief, and was accepted by Dr. Zdeblick's journal for publication on July 30, 2002.

142.    At the same time Dr. Zdeblick's journal was publishing the initial article on Infuse, Dr. Zdeblick was already finalizing and preparing for subsequent publication a follow-up article to

tout Infuse potentially as the new gold standard. A second article, co-authored by Dr. Zdeblick and two other co-authors of the original article, was entitled "Is Infuse Bone Graft Superior to Autograft Bone? An Integrated Analysis of Clinical Trials using the LT-Cage Lumbar Tapered Fusion Device."

143.    This second article was published in Vol. 2 of 2003 and once again, there was no mention of Dr. Zdeblick's financial ties to Medtronic.

144.    This second article would serve as the second covert advertisement for the Infuse product, and the article states that "the purpose of our analysis was to investigate the potential statistical superiority of Infuse bone graft to autograft..."

145.    This second article went on to announce the July 2002 FDA approval of rhBMP-2.

146.    This article included as an "acknowledgment" an expression of gratitude to the physicians "who provided patients for this study and to the clinic research group at Medtronic Sofamor Danek for their help in data collection and statistical analyses." However, the article still failed to advise the medical community that some or all of the authors reaching these conclusions touted as monumental had direct financial interests tied to those conclusions.

147.    Rather, the failure to report these clear conflicts of interest on the part of those holding positions of trust both within the medical community and over patients was part of Medtronic's fraudulent enterprise. However, unchecked by appropriate peer review, Medtronic was able to systematically accomplish their goals.

148.    In its 2003 Annual Report, and without recognizing that Zdeblick was being paid by Medtronic, Medtronic cited to Zdeblick's 2003 as reporting that Infuse "...may become the new gold standard in spinal fusion surgery."

149. By its 2006 Annual Report, if not earlier, Medtronic had removed all doubt, declaring that after its introduction in 2002, "Infuse Bone Graft quickly became the gold standard for certain types of lumbar fusion."

150. Medtronic's fraudulent scheme was successful and resulted in a revenue stream ranging from 700 to 900 million dollars per year.

151. It has been reported that around the same time these stories about Infuse were published, editors at the Spine Journal began receiving complaints from doctors around the country who were pointing out contradictions between papers published by doctors with financial ties to Medtronic and other data involving Infuse complications.' See *Journal Sentinel* article of John Fauber.

152. Through the use of these sham consulting, royalty and education/training agreements with its physician agents in this fraudulent enterprise, Medtronic has reaped windfalls in the billions of dollars. Medtronic has used this fraudulent enterprise and civil conspiracy to drive its vast profits and enhance its market position beyond that which it would have realized without engaging willfully, knowingly and potentially deliberate, conscious, or reckless indifference in the fraudulent enterprise and fraudulent concealment. See Mississippi case.

153. Defendants had full knowledge of all these facts pertaining to Medtronics.

## VI. FDA PUBLIC HEALTH NOTIFICATION

154. On July 1, 2008 the FDA issued a Public Health Notification entitled "Life-Threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion."

155. This notification was sent to health care practitioners all across the United States warning of the complications associated with BMP-2, specifically when used in the cervical spine.

162. Dr. Durrani and the Hospitals ignored ALL of these warnings and used BMP-2 in cervical spine surgeries, children, and those with known compromising factors such as osteoporosis, smoking, and diabetes.

163. Furthermore, the Notification stated that the FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices.

164. The Hospitals that allowed Dr. Durrani to use BMP-2 in their facilities failed to report any complications resulting from his use of BMP-2.

## VII. SENATE FINANCE COMMITTEE REPORT

165. Medtronic's actions did not go unnoticed, and in June of 2011 the Senate Finance Committee began an investigation into the fraudulent actions of Medtronic.

166. Medtronic produced more than 5,000 documents pertaining to 13 different studies of BMP-2 for the investigation.

167. On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into Medtronic, which revealed questionable ties between the medical technology company and the physician consultants tasked with testing and reviewing Medtronic products.

168. The investigation revealed that Medtronic employees collaborated with physician authors to edit and write segments of published studies on BMP-2/Infuse without publicly disclosing this collaboration.

169. These fraudulently-produced studies may have inaccurately represented BMP-2's risks and may have placed added weight on the side effects of alternative treatments.

170.    The Senate investigation further found that Medtronic also maintained significant, previously undisclosed financial ties with physicians who authored studies about BMP-2, making $210 million in payments to physicians over a 15-year period.

171.    Senator Baucus stated, "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. Patients everywhere will be better served by a more open, honest system without this kind of collusion."

172.    Senator Grassley stated, "The findings also should prompt medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and the studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It's in the interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

173.    Major findings of the investigation include:

        a.    Medtronic was involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's role in authoring or substantially editing these articles was not disclosed in the published articles. Medical journals should ensure that any industry role in drafting articles or contributions to authors is fully disclosed.

        b.    Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

c.    An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with BMP-2/Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

d.    Medtronic officials inserted language into studies that promoted BMP-2 as a better technique than an alternative by emphasizing the pain associated with the alternative.

e.    Documents indicate that Medtronic prepared one expert's remarks to the FDA advisory panel meeting prior to BMP-2 being approved. At the time, the expert was a private physician but was later hired to be a vice president at Medtronic in 2007.

f.    Medtronic documents show the company successfully attempted to adopt weaker safety rules for a clinical trial studying BMP-2 in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## VIII.   YODA STUDY

174.    In response to the various controversies surrounding BMP-2/Infuse, including a June 2011 article in the journal *Spine,* the Yale University Open Data Access (YODA) team reached an agreement for Medtronic to provide full individual participant data from all their trials of rhBMP-2 and allow unrestricted independent re-analysis of this data.

175.    The YODA study involved research teams at two universities – the University of York and the Oregon Health and Science University.

176.    The review focused exclusively on the use of rhBMP-2 in patients undergoing spinal fusion surgery for treatment of degenerative disc disease, spondylolisthesis, or any other relevant spinal condition.

177.    The three main objectives of the study were: 1) to examine the potential benefits of BMP-2, 2) to examine the potential harms of BMP-2, and 3) to assess the reliability of the published evidence base.

178.    Medtronic submitted data from 17 studies, including 12 randomized controlled trials (RCTs).

179.    In total, the YODA study analyzed the data from 1,409 participants.

180.    Though the results showed moderate success with fusions as a result of BMP-2, the study found that BMP-2 results in several different complications including: arthritis, implant-related events, retrograde ejaculation, wound complications, and neurological, urogenital, and vascular events.

181.    In regard to the alleged tampering with the peer-reviewed studies by Medtronic, the YODA study found that only two out of twenty peer-reviewed journal publications reported a comprehensive list of all adverse events that occurred during the studies.

182.    Furthermore, the way in which adverse event data was presented in the literature was inconsistent, and the rationale for presenting some adverse events but not others was rarely clear.

183.    The study concluded that for the period up to 24 months after surgery, treatment with BMP-2 increases the probability of successful fusion (according to Medtronic definitions and reports, which the study noted "were subjective so it is not possible to confirm whether reported successful fusions truly were successful" see YODA Study, p. 35) but this does not translate to clinically meaningful benefits in pain reduction, function, or quality of life. The small benefits in these outcomes observed from six months onward come at the expense of more pain in the immediate post-operative period and a possible increased risk of cancer.

184.    Even more relevant to the case against Dr. Durrani and the Hospitals is the YODA study's conclusion that, "[i]t is very important that these findings are expressed clearly and discussed with patients so that they can make informed choices about the type of surgery they would prefer." *Id.*

185.    The University of Oregon Study determined that Infuse/BMP-2 is not better than Autograft, while the University of York study determined that Infuse/BMP-2 offers only a slight and not statistically significant advantage over Autograft.

186.    The YODA study concluded that Medtronic "misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting."

187.    Adverse event categories such as heterotopic bone formation, osteolysis, and radiculitis were not included in participant databases or internal reports; therefore, the safety profile was not fully assessed.

188.    The YODA study further concluded that Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse/BMP-2 authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

189.    Medtronic paid a total of approximately $210 million to the physician authors of Medtronic-sponsored studies on Infuse from November 1996 through 2010 for consulting, royalty and other arrangements.

190.    An email exchange showed that a Medtronic employee recommended against publishing a complete list of adverse events or side effects possibly associated with Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

191.    Medtronic officials inserted language into studies that promoted Infuse as a better

technique than an alternative procedure by overemphasizing the pain associated with the

alternative procedure.

192.    Medtronic's actions violated the trust patients have in their medical care. Medical journal

articles should convey an accurate picture of the risks and benefits of drugs and medical devices,

but patients are at serious risk when companies distort the facts the way Medtronic has. See

United States Senate Committee on Finance, October 2012.

193.    Infuse was intended for a single level anterior lumbar interbody fusion performed with all

three components in a specific spinal region. The three components are a tapered metallic spinal

fusion cage (NOT PLASTIC), a recombinant human (BMP) bone Morphogenetic Protein, and a

carrier/scaffold for the BMP and resulting bone. The Infuse product is inserted into the LT-

CAGE Lumbar tapered Fusion Device component to form the complete Infuse Bone Graft/LT–

Cage Lumbar Tapered Fusion Device. These components must be used as a system. The Infuse

Bone Graft component must not be uses without the LT-Cage Lumbar Tapered Fusion Device

component.

194.    BMP-2 is not supposed to be used in minors.

195.    BMP-2 is not supposed to be used with smokers and diabetics because of vascular

slowing.

196.    BMP-2 should not be used with women in child bearing years.

197.    BMP-2 is contraindicated for patients with a known hypersensitivity to rhBMP-2 and

should not be used in the vicinity of a resected or extant tumor, in patients with active

malignancy, or in patients undergoing treatment for a malignancy.

## IX.   DR. DURRANI AND BMP-2

198.   Despite all of these warning signs, Dr. Durrani, with the full knowledge of the

Defendants, continued to use BMP-2 in ways not approved by the FDA, or in an "off-label"

manner.

199.   As early as 2007, Dr. Durrani and UC Health knew there were issues with BMP-2

because insurance companies such as Anthem were refusing to pay for BMP-2.

200.   Medtronic provided in writing to Dr. Durrani and CAST the approved uses for

Infuse/BMP-2.

201.   However, Dr. Durrani and the Defendants continued to use BMP-2 in off-label ways,

including but not limited to:

> a.     Using BMP-2/Infuse in children, despite Medtronic specifically requiring it be
> used only in "skeletally mature patients;"
>
> b.     Using it outside the L2-S1 level of the spine;
>
> c.     Ignoring the requirement that BMP-2/Infuse only be used for Grade 1
> spondylolisthesis or Grade 1 retrolisthesis;
>
> d.     Not requiring at least six months of non-operative treatment prior to the use of
> BMP-2/Infuse;
>
> e.     Using BMP-2/Infuse without the required cage;
>
> f.     Not using the "carrier scaffold" in conjunction with BMP-2/Infuse as required;
>
> g.     Using BMP-2/Infuse without proper training despite Medtronic's warning,
> "Caution: Federal (USA) law restricts this device to sale by or on the order of a physician
> with appropriate training or experience."

202.   Dr. Durrani was a paid consultant for Medtronic.

203.    According to Dr. Durrani's own deposition testimony in several cases, Medtronic

required one of their representatives to be present in the operating room when its product BMP-

2/Infuse is used.

204.    Because Medtronic representatives were present in these surgeries, Medtronic knew

when Dr. Durrani used BMP-2/Infuse outside the approved uses according to Medtronic's own

guidelines.

205.    Dr. Durrani was encouraged by Medtronic to obtain peer review and published studies

from Medtronic sales representatives to support his use of BMP-2/Infuse.

206.    Dr. Durrani was encouraged by Medtronic to be an advocate for his patients and describe

how BMP-2/Infuse technology can benefit them.

207.    When asked how he got his Medtronic grant, Dr. Durrani responded, "You apply to the

Medtronic's corporate and say this is what we want to do, like everybody else in the country

applies, and then they come and evaluate the thing and say, "Okay, we think it's worthy. We'll

give you the grant."

208.    In regard to his role as a Medtronic consultant, Dr. Durrani stated, "If there are certain

products that they help us in developing, then they will come to us for a certain consultant role

for a certain product development."

209.    Dr. Durrani also stated, "I was involved in the development of the minimally invasive

spine instrumentation."

210.    Dr. Durrani gave conflicting reports on his financial relationship with Medtronic.

211.    In a deposition, when asked when his relationship with Medtronic began, Dr. Durrani

responded "2000-it's 2003, '04. Something in that category. I'm not sure. It's on the Medtronic

website. You can go look at it."

212.    Medtronic's website has no information regarding their relationship with Dr. Durrani.

213.    In another deposition, Dr. Durrani stated he began his relationship with Medtronic in "2005 or '06."

214.    Dr. Durrani also gave conflicting reports on how much compensation he received from Medtronic for his consultation services.

215.    In one deposition, Dr. Durrani stated in response to an inquiry as to how much payment he received, "It's a standard compensation. Again, it's on the website, how much they've paid us."

216.    Again, this information is not available on the Medtronic website.

217.    In another deposition, when asked if he received income from Medtronic, Dr. Durrani replied, "No, I don't."

218.    When questioned further if he received a fee as a consultant, he stated, "If you do a work, there is a contractual obligation that they have to pay you. As I told you in my last deposition, they did declare it on their website, so you can actually go on the website and see how much they paid."

219.    In another deposition, Dr. Durrani stated that he received, "less than $10,000 in ten years" from Medtronic.

220.    An email dated July 30, 2008 from Medtronic Senior Product Manager Katie Stamps to Dr. Durrani states that she "is in the process of working on the renewal of your [Dr. Durrani's] consulting agreement." As stated, this information is not available on Medtronic's website, nor is any information relating to Dr. Durrani's role as a consultant for Medtronic.

221.    A CCHMC packet relating to its Orthopedics department indicated that Dr. Durrani received $60,000 in grants, contracts, or industry agreements from Medtronic Sofamor Danek in FY 2008.

222.    Financial information discovered concerning Dr. Durrani's relationship with Medtronic was found in Dr. Durrani's biography on the website for the Orthopaedic & Spine Institute, which Dr. Durrani currently operates in Pakistan. The biography states that "Dr. Atiq Dr. Durrani has also received the Clinical Spine Fellowship Grant by the Department of Orthopaedic Surgery which was funded by Medtronic Sofamor Danek with a budget of $59,170 per year." See http://www.osi.com.pk/doctor/dr-atiq-Dr. Durrani-md/.

223.    When a request was made to Medtronic regarding its affiliation with Dr. Durrani, the Medtronic Supplier Relations Team stated that Dr. Durrani's "name [is] not listed in our system."

224.    Medtronic further responded to the Deters Law Firm's request that the firm would need a "Vendor I.D. Number," which neither Medtronic nor any other party has provided.

225.    David Rattigan, was Dr. Durrani's main Medtronic representative from Bahler Medical.

226.    David Rattigan and Medtronic have the same lawyer. Despite the Deters Law Firm's willingness to cooperate in scheduling the date for a deposition, they have refused until recently. Mr. Rattigan's deposition was taken June 5, 2015.

227.    In summary, clients of the Deters Law Firm, with the full knowledge and intentional consent of all Defendants, became unsuspecting experiments for real world testing of Medtronic hardware and BMP-2, by and through Dr. Durrani and CAST, who had secret financial connections to Medtronic, improper motives, and submitted false claims. The government paid

for many of these improper and unregulated experiments as a result of the false claims made by Dr. Durrani, with the knowledge of Medtronic, under the veil of "medically necessary" surgeries.

228. Despite repeated requests, Medtronic has refused to cooperate in providing any requested information and is actively downplaying their connections to Dr. Durrani.

## X.      THE DEFENDANTS AND BMP-2

229. The purpose of the background information on the following Defendants and BMP-2 concerning other hospitals is to show the egregious methods, which upon information and belief were used at all hospitals.

230     The Defendants allowed and encouraged these practices by Dr. Durrani for the sole purpose of money and greed.

231.    David Rattigan was always present in Dr. Durrani's operating rooms as a representative of Medtronic.

232.    David Rattigan's sole job was to deliver the BMP-2/Infuse to the Hospitals and make sure that it was inserted correctly into the patient.

233.    David Rattigan's presence in the OR further supports the Defendants awareness of Dr. Durrani's fraudulent use of BMP-2/Infuse.

234.    **Informed Consent for Surgical or Medical Procedure and Sedation:**

It is the responsibly of the attending physician to obtain informed consent prior to the procedure. The patient, or his/her representative, will be advised by his/her physician of:

  a.      The explanation of the procedure

  b.      The benefits of the procedure

  c.      The potential problems that might occur during recuperation

  d.      The risks and side effects of the procedure which could include but are not limited to severe blood loss, infection, stroke or death.

      e.      The benefits, risks and side effect of alternative procedures including the consequences of declining this procedure or any alternative procedures.

      f.      The likelihood of achieving satisfactory results

Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

235.    The Defendants had the responsibility to carry out these consent rules.

236.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

237.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

238.    Dr. Durrani is a consultant for Medtronic.

239.    Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

240.    Medtronic, provided in writing to Dr. Durrani the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

241.    BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

242.    BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

243.    For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in

conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

244. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

245. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

246. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

247. Dr. Durrani and Children's Hospital personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

248. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

249. Defendants did not inform Plaintiffs that Dr. Durrani used Infuse/BMP-2 in his surgeries.

250. Plaintiffs would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

251. Plaintiffs would not have consented to the use of BMP-2 in Plaintiff's body if informed of the risks by Dr. Durrani or any Children's Hospital personnel.

252. The written informed consent of Dr. Durrani signed by Plaintiffs lacked the disclosure of Infuse/BMP-2's use in his procedures.

253.    Plaintiffs never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani or any Children's Hospital personnel.

254.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

255.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

256.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

257.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

258.    Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.


## INFUSE/BMP-2

259.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

260.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

261.    Dr. Durrani is a consultant for Medtronic.

262.    Defendants did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

263.    Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

264.    BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

265. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

266. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

267. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

268. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

269. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

270. Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

271. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

272. Plaintiff was not informed by Defendants that Dr. Durrani used Infuse/BMP-2 in his surgery.

273. Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

274. Plaintiff would not have consented to the use of BMP-2 in his body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

275. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in their procedure(s).

276. Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

277. Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

278. Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

279. Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

280. Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

281. Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## PUREGEN

282. Dr. Durrani oftentimes used Puregen when performing surgeries.

283. Puregen is a product produced by Alphatec Spine.

284. Dr. Durrani was and is a paid consultant for Alphatec Spine.

285. Dr. Durrani has an ownership stake in the Alphatec Spine.

286.     Puregen has never been approved by the FDA for any human use.

287.     Puregen is now removed from the market for any use.

288.     Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

289.     Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose their intent to use Puregen, nor did they inform Plaintiff that it was a product that was not approved by the FDA for human use.

290.     Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

291.     Plaintiff was not informed by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel that Dr. Durrani used Puregen in their surgery.

292.     Plaintiff would not have allowed Puregen to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA.

293.     Plaintiff would not have consented to the use of Puregen in his body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

294.     The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in their procedures.

295.     Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

## DR. DURRANI COUNTS:

### COUNT 1: NEGLIGENCE

296.     Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

297.     Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of

skill, care and diligence that an ordinarily prudent health care provider would have exercised

under same or similar circumstances through, among other things, negligent diagnosis, medical

mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for

surgery, improper performance of the surgery, and improper follow-up care addressing a

patient's concerns.

298.     As a direct and proximate result of the aforementioned negligence and deviation from

the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages

requested in the Prayer for Relief.

## COUNT II: BATTERY

299.     Dr. Durrani committed battery against Plaintiff by performing a surgery that was

unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly

obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for

surgeries not approved by the FDA and medical community, and by the failure to provide this

information to Plaintiff.

300.     Plaintiff would not have agreed to the surgeries if he knew the surgery was

unnecessary, not approved by the FDA, and not indicated.

301.     As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff

sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

302.     The informed consent forms from Dr. Durrani and CAST which they required Plaintiff

to sign failed to fully cover all the information necessary and required for the procedures and

surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

303.     In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

304.     Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with their surgery and procedures.

305.     Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

306.     As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

307.     Dr. Durrani's conduct as described above was intentional and reckless.

308.     It is outrageous and offends against the generally accepted standards of morality.

309.     It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

310.     Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

311.     Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgery was necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally

within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

312.    Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

313.    These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

314.    Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

315.    Dr. Durrani made the misrepresentations both before, during and after the surgery with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgery, and to induce Plaintiff to undergo the surgery without regard to medical necessity and only for the purpose of receiving payment.

316.    The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

317.    Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

318.    As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo

surgery which were paid for in whole or in part by their insurance company, and suffered all

damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

319.    Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled

("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

320.    Dr. Durrani spoiled evidence with knowledge that there was pending or probable

litigation involving Plaintiff.

321.    Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case,

and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

322.    At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

323.    Dr. Durrani is in fact, the owner of CAST.

324.    Defendant Dr. Durrani was performing within the scope of his employment with CAST

during the care and treatment of Plaintiff.

325.    Defendant CAST is responsible for harm caused by acts of its employees for conduct that

was within the scope of employment under the theory of respondeat superior.

326.    Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in

this Complaint including all of the counts asserted against Dr. Durrani directly.

327.    As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff

sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

328.    CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

329.    CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

330.    CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

331.    The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

332.    Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

333.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: SPOLIATION OF EVIDENCE

334.    CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

335.    CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

336.    CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: FRAUD

337.    CAST sent out billing to Plaintiff's insurance company after the surgeries at WCH.

338.    The exact dates these medical bills were sent out are reflected in those medical bills.

339.    These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

340.    The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital associated with Dr. Shanti and Dr. Durrani were not appropriate.

341.    The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

342.    Plaintiff relied on the facility holding Dr. Shanit and Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

343.    As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

344. CAST also either concealed from Plaintiff that they knew about Dr. Durrani and Dr. Shanti misrepresenting to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

345. CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

346. Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

347. CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Shanti and Dr. Durrani performed on Plaintiff at WCH.

348. Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for Plaintiff's surgery.

349. Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital.

350. Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

351. Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for Plaintiff's surgery.

352. As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

353.    West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

354.    West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery and improper follow up care addressing a patient's concerns.

355.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgery.

356.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

357.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiff

sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

358.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr.

Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery,

and fraud.

359.    West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr.

Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

        a.    Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws

           with it's full knowledge of the same;

        b.    Failing to adequately review, look into, and otherwise investigate Dr. Durrani's

           educational background, work history and peer reviews when he applied for and

           reapplied for privileges at West Chester Hospital;

        c.    Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West

           Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

        d.    Ignoring information they knew or should have known pertaining to Dr. Durrani's

           previous privileged time at other Cincinnati area hospitals, including Children's Hospital,

           University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

360.    The Safe Medical Device Act required entities such as West Chester Hospital/UC Health

to report serious injuries, serious illnesses, and deaths related to failed medical devices to the

FDA and the manufacturer; this was never done.

361.    As a direct and proximate result of the negligent credentialing, supervision, and

retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

362.     Upon information and belief, Plaintiff believes the bills requested by Plaintiff will

indicate that Children's Hospital falsely represented that Plaintiff's surgery was

appropriately indicated, performed, and medically necessary in contra-indication of the

standard of care.

363.     West Chester Hospital/UC Health sent out billing to Plaintiff at his home

following his surgery at West Chester Hospital.

364.     The exact dates these medical bills were sent out are reflected in those medical

bills.

365.     These bills constituted affirmative representations by West Chester Hospital/UC

Health that the charges related to Plaintiff's surgery were medically appropriate and

properly documented.

366.     The bills were sent with the knowledge of West Chester Hospital/UC Health that

in fact Plaintiff's surgery was not appropriately billed and documented and that the

service rendered at West Chester Hospital/UC Health associated with Dr. Durrani was

not appropriate.

367.     The bills sent by West Chester Hospital/UC Health to Plaintiff's falsely

represented that Plaintiff's surgery was appropriately indicated, performed and medically

necessary in contra-indication of the standard of care.

368.     Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing

him to perform surgeries at its health care facility as assurance the facility was overseeing

Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing

Plaintiff for West Chester Hospital/UC Health's services in association with Dr.
Durrani's surgery(ies).

369. West Chester Hospital/UC Health concealed information they knew about Dr.
Durrani, including BMP-2/Puregen, from Plaintiff which if not concealed Plaintiff would
not have allowed Dr. Durrani to perform surgery.

370. As a direct and proximate result of the fraud upon Plaintiffs by West Chester
Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

371. West Chester Hospital/UC Health sent out billing to Plaintiff at his home
following his surgeries at West Chester Hospital.

372. The exact dates these medical bills were sent out are reflected in those medical
bills.

373. These bills constituted affirmative representations by West Chester Hospital/UC
Health that the charges related to Plaintiff's surgery were medically appropriate and
properly documented.

374. The bills were sent with the knowledge of West Chester Hospital/UC Health that
in fact Plaintiff's surgery was not appropriately billed and documented and that the
services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were
not appropriate.

375. The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented
that Plaintiff's surgery was appropriately indicated, performed and medically necessary
in contra-indication of the standard of care.

376. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing
him to perform surgeries at its health care facility as assurance the facility was overseeing

Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgeries.

377. As a direct and proximate result of this reliance on the billing of West Chester Hospital/UC Health, Plaintiff incurred medical bills that he otherwise would not have incurred.

378. West Chester Hospital/UC Health also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

379. West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgery were material facts.

380. Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

381. West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgery and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

382. Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

383.    Had Plaintiff known before Plaintiff's surgery that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital/UC Health.

384.    Upon information and belief, Plaintiff believes that the itemized billing from Children's Hospital, which has been requested, will show that Infuse/BMP-2 and/or Puregen was used in Plaintiff's surgery.

385.    Plaintiff is still awaiting itemized billing from Children's Hospital reflecting the exact totals of charges made for Plaintiff's surgery.

386.    As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT IV: SPOLIATION OF EVIDENCE

387.    West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

388.    West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

389.    West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request and seek justice in the form and procedure of a jury,

verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code

§2315.18;

9.    All incidental costs and expenses incurred as a result of their injuries;

10.   The damages to their credit as a result of their injuries;

11.   Punitive damages;

12.   Costs;

13.   Attorneys' fees;

14.   Interest;

15.   All property loss;

16.   All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum jurisdictional

amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)



Mar. 26. 2014 9:30AM M A No. 0263 P. 1

### Affidavit of Merit

I, Keith Wilkey, M.D., after being duly sworn and cautioned state as follows:

1. I have reviewed all relevant medical records reasonably available about Steven Andrew Schultz concerning the allegations of medical negligence.

2. I am familiar with the applicable standard of care.

3. Based upon my review of this record, my education, my training, and experience, it is my belief, to a reasonable degree of medical certainty that the care provided by the Defendants Dr. Abubakar Atiq Durrani, CAST, West Chester Hospital and UC Health was negligent, and this negligence caused injury to Steven Andrew Schultz, *inter alia*, increased pain and suffering, decreased ability to perform job-related and everyday tasks, loss of quality in personal and family life, loss of enjoyment of life and future loss enjoyment of life, creating financial burden and loss of wages, causing need to have an additional surgery to repair problems created by one unnecessary surgery, due to 14L of blood loss, failure to obtain proper informed consent for surgery, failure to provide adequate and thorough pre-operative and post-operative patient surgical education and monitoring, negligent surgical techniques, failure to maintain accurate and complete surgical records and surgical consent forms, failure to supervise Dr. Durrani, negligent pre-surgical diagnosis, health care fraud, battery, negligent treatment, practicing outside the scope of training, education, experience, and Board certifications, and medical negligence, not being adequately trained in the procedure performed and stating he had done 200 of these procedures, and obtaining fraudulent credentialing for this type of procedure.

4. One surgery involving the implantation of Infuse/BMP-2, which carries a 3.5 percent increased risk for developing cancer and an increased risk for retrograde ejaculation for which has subsequently been diagnosed.

5. One surgery in which Dr. Durrani severed an artery in the presacral region and rectosigmoid mesenteric region, left the Operating Room to start another surgery, was called back in to address the hemorrhage requiring Steven Andrew Schults to be transfused of 14 units of blood, and asking the assistance of a vascular surgeon to repair the artery. Durrani was not trained properly in this type of procedure.

6. Operative and office visit documents state "risks and benefits, pros and cons were discussed in detail", but Steven Andrew Schultz was never adequately informed about the surgical procedure or that Durrani was not trained in this type of procedure where he lost 14L of blood, obtained fraudulent credentialing, and that he had done 200 cases when he had not.

7. Dr. Durrani recommended a lumbar surgery based upon his own exaggerated radiology/imaging interpretations and falsifying past medical history. Dr. Durrani told Steven Andrew Schultz that the MRI showed a bilateral pars fracture at L5-S1 with stenosis in his lumbar

spine and that he needed surgery to correct this and to alleviate the pain. However, according to Dr. Set Shahbabian, another spinal surgeon, he did not need surgery and would not recommend surgery.

8. Dr. Durrani recommended surgery without offering options for conservative management.

9. Dr. Durrani employed misleading statements in effort to have client agree to surgery. Dr. Durrani advised Steven Andrew Schultz he would be using two screws in his surgery. It was only afterwards that he found out Dr. Durrani used an AxiaLFT and Infuse/BMP-2 in his surgery.

10. Improperly executed and uninformed consents: For the surgery performed 09/26/11: "According to 42 CFR §482.24(c)(2)(v), the statutory authority for regulation of health care facilities accredited by Medicare and Medicaid, all inpatient and outpatient medical records must contain a properly-executed-and-completed written informed consent form for all procedures and treatments specified by the hospital's medical staff or by state or federal laws or regulations. Any physician with privileges at such facilities must follow the requirements on informed consent for all patients, not just Medicare and Medicaid patients. The physician must provide the patient or legal representative with information about the planned procedure and its risks. The physician should use plain, simple language and avoid "medicalese" or medical terminology".

11. The West Chester/ UC Health management, medical staff, and hospital staff involved in Steven Andrew Schultz's care and surgery knew or should have known about Dr. Durrani not being properly train in the type of procedure performed on Steven Andrew Schultz and should have checked into his credentialing. West Chester/ UC Health management, medical staff, and hospital staff also knew about Dr. Durrani's performing unnecessary procedures and using substandard surgical techniques. The hospital staff and management were negligent in not assuring full disclosure and proper consent was obtained from Steven Andrew Schultz prior to surgery. In addition, management and administration failed to follow medical staff bylaws and policies pertaining to the issues outlined in this document, including supervision of Dr. Durrani.

12. Dr. Durrani and West Chester Hospital/UC Health made false and material misrepresentations of facts intended to mislead Steven Andrew Schultz. Dr. Durrani and West Chester Hospital/UC Health concealed material facts they had a duty to disclose. Steven Andrew Schultz was justified in relying on the misrepresentation, which proximately caused harm to Steven Andrew Schultz. Steven Andrew Schultz had the right to correct information.

13. Dr. Durrani and West Chester Hospital/UC Health deviated from the standard of care and that deviation was the proximate cause of injury to Steven Andrew Schultz.

14. To a reasonable degree of medical certainty, damages suffered by Steven Andrew Schultz includes aggravation of pre-existing condition; past, present and future pain and suffering; past, present and future loss of enjoyment of life; past and future medical bills; permanent disability resulting in past and future lost wages; and employment benefits; permanent injury; and substantial physical deformity.

15. For disclosure purposes, I also attach and adopt the Nurse Review.

16. My curriculum vitae is attached.

17. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school.

18. Subject to receiving new information, these opinions are subject to amendment.

**FURTHER AFFIANT SAYETH NAUGHT.**

Keith Wilkey, M.D.

STATE OF Missouri )
COUNTY OF St. Louis )

SUBSCRIBED, SWORN TO, AND ACKNOWLEDGED, before me, a Notary Public, by Keith Wilkey, M.D on the 26 day of March, 2014.

Angela Kay Poinsett
Notary Public

My Commission, Expires 07/18/2015

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11139813

**STEVEN ANDREW SCHULTZ**
**SUPPLEMENTAL AFFIDAVIT OF MERIT**
**OF DR. WILKEY**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. Steven Andrew Schultz (DOB 08/01/1984) underwent two surgeries completed by Dr. Durrani at West Chester Hospital. The first surgery was on 09/26/11, and the procedure was documented as an L5-S1 AxiaLIF. Multiple screw and rod instrumentation were placed during said procedure, as well as Infuse (rhBMP-2).

2. Approximately five months later, an L-Spine CT(02/17/12) ordered by Dr. Durrani revealed the S1 vertically-oriented transpedicular screw traverses through the L5-S1 disc space and extends beyond the anterior margin of the cortex. There is no solid bridging." Dr. Durrani failed to disclose this finding to Steven Schulze regarding loose hardware from the first surgery on 09/26/11 and instead focused on L4-5.

3. The second surgery was on 03/07/12 at West Chester Hospital, and the documented procedures performed were lumbar hemilaminectomy L4-L5, lumbar discectomy L4-L5, right side. The documented preoperative and postoperative diagnoses were lumbar spinal stenosis L4-L5, lumbar disc herniation, L4-L5, right side, lumbar radiculopathy, L4-L5, right side.

4. Two years prior to this second surgery date on 04/23/10, Steven had undergone a diskogram at Christ Hospital, ordered by Dr. Durrani. The results revealed a normal appearing L4-5 with no significant disc protrusion or herniation. On 04/27/10, Dr. Durrani had dictated in an office note regarding a diskogram "His L4-5 is completely normal." Additionally, on 06/30/11, Dr. Durrani dictates in an office note regarding the diskogram, "Normal control at L4-5". On 02/17/12, an L-Spine CT ordered by Dr. Shanti of CAST revealed a normal L4-5. On 02/27/12, an L-Spine MRI ordered by Dr. Durrani revealed a minimal disc bulge and mild disc space narrowing at L4-5. An L-Spine MRI on 09/13/12, six months after the L4-5 surgery by Dr. Durrani, again shows mild disc bulge and disc signal changes at L4-5, but also reveals a new small focal area of increased strength, which may represent an annular tear. An L-Spine CT on 09/29/12 shows a diffuse posterior disc bulge at L4-5 with suspected right lateral recess disc protrusion, which may impinge upon the descending right L5 nerve root. In essence, Dr. Durrani performed an unnecessary, unwarranted surgery on Steven's L4-5, causing harm and need for further surgery.

1

5. Dr. Durrani and the staff of CAST failed to maintain complete and accurate surgical records regarding the need for surgery on L4-5 on 03/07/12.

6. Dr. Durrani at West Chester Hospital dictates misleading and exaggerated information and diagnoses regarding medical necessity of surgery on 03/07/12.

7. Dr. Durrani at CAST dictates misleading and exaggerated information and diagnoses regarding medical necessity of surgery on 03/07/12.

8. Dr. Durrani and the staff of CAST failed to disclose to Steven Schultz pertinent information regarding need for the second surgery on 03/07/12.

9. Dr. Durrani and the staff of CAST intentionally misled Steven Schultz and made false, inflammatory, and exaggerated radiologic interpretations and misrepresentations of material facts regarding the medical necessity of a second surgery on 03/07/12. Additionally, Steven Schulze's previously normal L4-5 was compromised by Dr. Durrani since the unnecessary surgery.

10. Steven Schultz had the right to the correct information to make an informed preoperative choice regarding the condition of his L4-5 spine level.

11. On 01/04/13, Dr. Chris Bohinski of Mayfield Clinic evaluated Steven and stated, "Imaging studies reveal evidence of incomplete fusion at L5-S1. The pedicle screw in right S1 pedicle is placed more anteriorly than would be desirable. In addition, the left L4-5 pedicle screw grossly violates the facet articulation at L4-5. In fact, there appears to be a fracture of the facet at that level." He recommended a revision surgery.

12. On 02/12/2013, Steven underwent revision surgery completed by Dr. Robert Bohinski and Dr. Sashi Kilaru at Christ Hospital. The documented procedures performed were anterior lumbar interbody fusion from L4 to S1, posterior pedicle screws at L4 with extension of construct to include L4 to S1 with posterolateral arthrodesis. The documented pre and postoperative diagnoses were pseudoarthrosis at L5-S1 and broad-base disc herniation at L4-L5 with spinal stenosis and neurogenic claudication. Dr. Bohinski dictates in his OR report, "The previous bone graft material (Infuse placed in initial surgery on 09/26/11) had the appearance of a play dough consistency and had clearly not incorporated into the endplates. This was removed completely." Dr. Kilaru states in his OR report, "He required an emergent anterior approach for litigation of pelvic bleeders during initial surgery (09/26/11), which he likely developed retrograde ejaculation from this procedure as well."

13. The revision surgery by Mayfield Clinic was needed based on the careless, unnecessary, and negligent surgeries performed by Dr. Durrani.

Subject to receiving new information, these opinions are subject to amendment.

2

AFFIANT SAYETH FURTHER NOT

_____

                                    KEITH D. WILKEY, M.D.

## NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this 24 day of December, 2014.

SUSAN K. VIETMEIER
My Commission Expires
February 13, 2015
St. Louis County
Commission #11008631

                        Susan K. Vietmeier
                        NOTARY PUBLIC
                        My Commission Exp.: 2-13-15

                        St. Louis County

                        State of MO

3